Bluegrass Plant Foods, Inc. v. Commissioner.Bluegrass Plant Foods, Inc. v. CommissionerDocket No. 65702.United States Tax CourtT.C. Memo 1958-53; 1958 Tax Ct. Memo LEXIS 183; 17 T.C.M. (CCH) 271; T.C.M. (RIA) 58053; March 31, 1958*183 Held: To the extent the aggregate amounts paid petitioner's president and vice-president during each of its fiscal years ended in 1954 and 1955 exceeded $80,000, such amounts did not constitute reasonable allowances for salaries or other compensation for personal services actually rendered and are not deductible as ordinary and necessary business expenses within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, and section 162(a), Internal Revenue Code of 1954. William R. Bagby, Esq., 615 First National Bank Building, Lexington, Ky., for the petitioner. Stanley E. Jennings, Esq., for the respondent. BRUCE Memorandum Findings*184 of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioner as follows: Year EndedDeficiency6-30-54$26,737.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,445.47 The only issue for decision is whether a deduction claimed for officers' salaries paid during each of the years in issue is reasonable. Findings of Fact The stipulated facts and attached exhibits are incorporated herein by this reference. The petitioner is a corporation organized under the laws of the Commonwealth of Kentucky with its principal office at 447 Main Street, Cynthiana, Kentucky. The income tax returns of petitioner for the years in issue were prepared according to an accrual basis of accounting and a taxable year ending June 30. Such returns were timely filed with the district collector of internal revenue at Louisville, Kentucky. Petitioner was incorporated in 1948. Since that time it has been engaged in the manufacture and sale of fertilizers and plant foods. Since 1952 petitioner has also engaged in the operation of a thoroughbred racing stable. The petitioner's officers since its incorporation have been as follows: Osmer S. Deming, president; Gene Van Deren, vice-president, *185 treasurer and general manager; Anna Martha Van Deren, wife of Gene, secretary. During the period in issue there were outstanding 460 shares of capital stock of petitioner having a par value of $100 per share, of which stock 340 shares were owned by Deming and his family and the remaining 120 shares were owned by Van Deren and his wife. Prior to the incorporation of petitioner Deming was president of The Lexington Loose Leaf Tobacco Warehouse Co., which had been organized in 1937 and operated a tobacco warehouse in Lexington, Kentucky. At the time it was built in 1937 this was one of the largest tobacco warehouses in Lexington. Approximately three years after the petitioner was organized Deming sold his interest in The Lexington Loose Leaf Tobacco Warehouse Co. He has been a member of the board of directors of a bank in Cynthiana and a member of the board of trustees of several educational and charitable institutions in Kentucky for several years. During the period in issue Deming was president of the Superior Oil Co. of Miami, Florida, a corporation which he had formed approximately 30 years ago. He was also vice-president of the Red and White Oil Co. in Miami, of which he was one*186 of the founders. Since 1937 he has served such companies solely in an advisory capacity. During the calendar years 1953, 1954, and 1955 Deming received compensation as an officer from the Superior Oil Co. and the Red and White Oil Co. as follows: YearSuperiorRed and White1953$12,000195416,000195512,000$14,400 *Van Deren is a resident of Cynthiana. Prior to the incorporation of petitioner Van Deren had been a buyer for Liggett & Myers Tobacco Co., for 13 years. In 1945 he went into a brokerage business involving the purchase of loose leaf tobacco. In the performance of his duties as buyer and broker Van Deren became acquainted with many farmers in the bluegrass area of Kentucky. Van Deren has devoted all of his business services to petitioner since about 1951. Harrison County, in which Cynthiana is located, is in the northern part of the central Kentucky bluegrass area. Petitioner sells fertilizer from its Cynthiana plant to farmers in the surrounding area of 38 counties in which they grow many acres of tobacco and grass. The tobacco grown*187 in this area is known as Burley tobacco and is one of the main crops grown by the farmers located therein. Prior to the time of the organization of petitioner most fertilizer sold in this area was sold through retail dealers. At this time Deming had a farm in Kentucky and through its operation and by observation he formed a belief that the tobacco farmers in the area were not satisfied with the services and the types of fertilizers available. In many instances it was necessary for the farmers to purchase fertilizer several months prior to the time it was used and they were not able to acquire fertilizer designed particularly for their soil and for growing tobacco. Having in mind the nature of the fertilizer problems of the farmers in this area, Deming and Van Deren decided to go into the fertilizer business. They determined to manufacture and sell tobacco fertilizers to the Kentucky Burley tobacco farmers and to cater primarily to the tobacco farmers in the central bluegrass area. To this end petitioner was organized, and construction of a fertilizer plant in Cynthiana was commenced in July 1948. Manufacturing of fertilizer began at the Cynthiana plant on November 13, 1948, and*188 the first sales were shipped in December of that year. In selling its product petitioner's officers, Deming and Van Deren, decided to offer service features which had not theretofore been available in the central Kentucky area. Such service consisted of (1) selling direct to the individual farmers instead of through retail dealers, and (2) preparing fertilizer designed especially to fit the needs of the particular soil to be fertilized. Fertilizer is typed according to the analysis of the materials contained therein and different analyses are properly applied to different types of soils. Deming and Van Deren believed that not enough different types were being made available to farmers and as a result and in accordance with the recommendations of the Kentucky Agricultural Experiment Station they decided that fertilizers containing a high ratio of potash would be of greater value to the tobacco farmers than those types generally used since such high potash fertilizers were believed to reduce the nicotine content of the tobacco. At the start of petitioner's operations it sold fertilizers of the common types which were being sold generally at that time. Beginning in 1949, having been*189 in contact with the Experiment Station, it was decided that petitioner would commence producing fertilizers with higher potash ratio. In Kentucky no fertilizer may be sold unless its analysis is first registered with the Agricultural Experiment Station. The analyses which were registered by petitioner in Kentucky and the respective dates of such registration are as follows: Analysis *Date of Registration6- 8-12 3M-9S12-15-494- 8-16 S12- 9-504- 8-12 3M-9S2-13-514- 9-12 S2-13-514- 8-16 4M-12S2-13-516- 6-18 S12-11-526-12-18 S12-11-525-10-15 S11-16-53"Letters following the analysis numbers reflect the potash sources, muriate, or sulphate. "A fertilizer is not considered a 'high potash' type unless the potash number is greater than the phosphoric acid number." Except for the analysis 5-10-15 S, petitioner was the first to register such analyses in Kentucky and the first to sell fertilizer with such analyses in that area. In many instances farmers in this area had their soil*190 tested either by the state or by private testing services. Through the use of such tests it was determined which of the standard, mass produced, types of fertilizers was best suited for the soil needs. In the instance of large landowners who had soil tests, petitioner sometimes manufactured a custom mix of fertilizer especially prepared for the particular land involved. Petitioner was the first to offer such custom mix service in the area. When petitioner was organized the two major analyses of fertilizers sold in the central Kentucky area were known as 6-8-6 and 4-12-8. During the period in issue such fertilizers were produced by petitioner but the demand therefor had been considerably supplanted by analyses containing higher potash ratios. At the time the Cynthiana plant was built the sale of tobacco fertilizer and delivery to farmers was spread out over a six or sevenmonth period from November to March or April. Due to some cuts in total tobacco acreage, the increased supply of raw materials for fertilizer and the program of petitioner aimed at giving the farmers better service, petitioner began selling about one-half of its fertilizer in a two-month period. The various analyses*191 of fertilizers prepared by petitioner are manufactured in separate batches and are stored in bins at the plant. Since the fertilizer must be bagged for sale to the farmer, the prepared fertilizer must be cured for approximately 30 days to prevent its hardening after bagging. Therefore, petitioner's plant capacity was limited by its storage space. The Cynthiana plant storage capacity during the period in issue was 5,000 tons. The capacity of a fertilizer plant is also influenced by the nature of the sales. When the sales are made over a period of several months the plant's capacity is greater, since it is able to replenish the fertilizer thus removed from its storage bins. Where the demand is over a two-month period, the capacity is lower. In order that it might cope with the seasonal demand for fertilizer as much as possible, petitioner arranged to have its entire storage capacity filled with prepared fertilizer at the beginning of the season which starts about the first of January. Sometime during 1951 and 1952, having been in contact with the tobacco industry generally, Deming and Van Deren formed the opinion that the outlook for Burley tobacco was not good due to the competition*192 of other types of tobacco and the prospect of acreage allotment cuts by the Federal Government. At that time most of the fertilizer being sold by petitioner was of a type primarily suited for growing tobacco. Petitioner had not sold much fertilizer for use in growing Kentucky bluegrass. Since the prospects for tobacco were unfavorable and the seasonal demand for tobacco fertilizer limited the sales capacity of petitioner, it was decided that petitioner would endeavor to manufacture and sell fertilizers designed for Kentucky bluegrass. In 1951 the tobacco acreage allowed farmers by the Federal Government was reduced approximately 14 per cent. In 1952 the acreage was increased 1 per cent. The total acreage allowed by the Federal Government has been reduced each year during the period 1953 to 1955, inclusive, as follows: YearPercentage of Decrease195310.0719548.35195525.00In order to carry out the plan for supplementing the declining market for tobacco fertilizer with sales of fertilizer to bluegrass growers, it was decided that an advertising campaign was needed to create a market for such fertilizer among the horse breeding farms in the area which purchased*193 large amounts of such fertilizer. Deming had owned a few race horses for several years and through such ownership had made some contacts with horse farm owners. To enlarge the scope of such contacts and to provide a source of advertising, in 1952 petitioner acquired a thoroughbred from a horse farm in the area in exchange for some fertilizer. The petitioner subsequently acquired more thoroughbreds and since such acquisition it has been able to sell an inceased amount of fertilizer to the large horse breeding farms in the area. In connection with their intent to diversify the products of petitioner and include fertilizer designed for bluegrass and in general to increase its sales capacity, Deming and Van Deren decided that petitioner should construct an additional fertilizer plant. Accordingly they examined possible sites in Indiana, Ohio, Mississippi and Tennessee as well as in Kentucky with a view of establishing a plant in an area which was not entirely dependent upon tobacco. They selected a site at Danville, Kentucky, and petitioner constructed a fertilizer plant there in 1953. Petitioner manufactured and sold fertilizer from its Danville plant during its fiscal year ended June 30, 1954. *194 Boyle County, in which Danville is located, is in the southern part of the central Kentucky bluegrass area and is about 70 miles from Cynthiana. Petitioner sells fertilizer from its Danville plant to farmers in a surrounding area of 42 counties in which they grow many acres of tobacco and grass. This area also includes counties which are a part of the Kentucky bluegrass area. Deming and Van Deren each drew several plans for the Danville plant and it was finally decided that construction would be based on the plans drawn by Van Deren. No architect was hired by petitioner in connection with the design of the plant. From their experience Van Deren and Deming knew the types of machinery needed and some of it was made to their specifications. Every detail in the construction of the Danville plant was personally supervised by Van Deren. Other than a contract for labor, no contract was made for the construction of the plant. Van Deren's supervision of the Danville plant construction covered a period of from three to four months, and was estimated to have saved petitioner $100,000. The storage capacity of the Danville plant is 12,000 tons. Due to the nature of the fertilizer business*195 it is necessary that a large inventory of manufactured fertilizer be carried. In petitioner's situation the amount of such inventory approached the total storage capacity which during the period in issue was 17,000 tons. In many instances the accounts receivable arising out of the sales of fertilizer by petitioner were not collected until July. To finance the carrying of such inventory and accounts receivable it was necessary during each of the years in issue for petitioner to borrow approximately $750,000. Of such amount petitioner borrowed approximately $500,000 from the First National Bank of Cincinnati. In approving the loan the Cincinnati bank took into consideration petitioner's management, collateral, profit and loss statement and balance sheet. The balance of the required amount was provided by Deming, his relatives and a bank in Cynthiana. All of such loans were secured by the personal endorsement of Deming and the Cincinnati bank would not have made loans to petitioner in the amount of $500,000 without Deming's personal endorsement. Since the early 1930's Deming has spent the first three or four months of each calendar year in Florida. During the time spent in Florida he*196 periodically returned to Kentucky to keep in personal touch with petitioner. He communicated with Van Deren by telephone approximately three times each week while in Florida. Petitioner's race horses spent the winters in Florida where they were trained. Deming had personal race horses there also and all of the horses were under the care of the same trainer. Deming kept in personal contact with such trainer while in Florida. Since the organization of petitioner Deming has been its chief executive. Since petitioner's incorporation Van Deren has been responsible for the sales end of the business. During the period in issue, in addition to Van Deren, petitioner employed at least four other salesmen on a full or part-time basis, all of whom were under Van Deren's direct supervision. Van Deren made most of the personal contacts with customers and prospective customers and made over 50 per cent of the total sales for the years in issue. Although Deming was not directly responsible for sales he did make some during the years in issue. He attended sales meetings and took part in the discussions therein. Through his tobacco warehouse, banking and race horse connections Deming made many personal*197 contacts and in many instances laid the foundation for the sales that were ultimately made by Van Deren. It is customary in the fertilizer business for manufacturers such as petitioner to contract for the entire amount of their raw materials between May 15 and June 30. Since the incorporation of petitioner the raw materials used in making fertilizer have been relatively difficult to acquire and in order to insure acquisition it is necessary to cultivate the good will of suppliers. In cultivating good will the petitioner, among other things, named three of its race horses for certain individuals in the fertilizer raw material business. Van Deren was responsible for making the purchase contracts with the suppliers of raw materials and the subsequent ordering of such materials for a definite delivery date. However, purchases were always fully discussed between Deming and Van Deren at the time of contracting and Deming made the final decision regarding the quantities and kinds of fertilizer materials purchased. Since such purchases were for the entire amount of raw materials to be used in the ensuing year, it was necessary to make an accurate estimate of raw material requirements. The*198 timely delivery of such materials to petitioner's plants was an important factor in their operation and making such arrangements was the responsibility of Van Deren. He was general superintendent of all operations in the manufacturing process of the fertilizers and personally supervised such operations. At the Danville plant he had an assistant who was in charge during his absence. Deming did not enter into direct personal supervision of the production phase of the business but kept in touch with such operation through Van Deren. After the construction of the Danville plant the number of petitioner's operating employees was more than doubled. When the plant was opened it was necessary to employ all new personnel for its operation with the exception of one or two persons who had worked at the Cynthiana plant. Van Deren and the plant superintendent at Danville were responsible for the training of the new employees. The books and records of petitioner show the following information regarding gross sales, net sales, net income and earned surplus: Year EndedJune 30Gross SalesNet SalesNet IncomeEarned Surplus1949$ 243,078.82$ 239,728.25**1950406,452.67401,129.52**1951579,972.25562,820.16$37,726.82*1952837,212.76813,452.4770,708.35$ 63,337.461953996,864.76965,842.6478,578.1095,050.1219541,519,499.081,468,680.8830,465.93115,023.7719551,363,702.201,315,293.5216,821.40128,675.3819561,566,285.691,388,324.82***199 Petitioner has never declared or paid a dividend. Petitioner's board of directors authorized the payment of compensation to Deming and Van Deren each in the amount of $15,000 for the fiscal year ended June 30, 1950. At a meeting of petitioner's board of directors on July 1, 1951, the following motion was considered and carried unanimously: "RESOLVED that the following officers be paid the following salaries for the ensuing year, viz: President$27,500.00Vice President and Treasurer27,500.00Secretary1,500.00 and it is further directed that said officers be paid such bonuses as may appear reasonable and in keeping with the earnings of said Corporation., not to exceed, however, the sum of $10,000.00 to the President and Vice President respectively; * * *" The petitioner's board of directors authorized compensation for Deming and Van Deren for each of the fiscal years ended June 30, 1953 through June 30, 1955, as follows: Year EndedJune 30DemingVan Deren1953$27,500$27,500195440,00040,000195540,00040,000During the fiscal years ended June 30, 1950 through*200 June 30, 1955 the petitioner paid as compensation to its two principal officers, O. S. Deming, president, and Gene Van Deren, vice-president and treasurer, the following amounts: Fiscal YearO. S.GeneEnded June 30DemingVan Deren1950$15,000.00$15,000.00195123,000.0023,000.00195224,380.0024,380.00195329,380.0029,380.00195449,999.96 *49,999.96 *195544,999.96 **44,999.96 **During the period in issue petitioner paid bonuses to several of its employees. The total tonnage of all fertilizer sold in Kentucky during each of the fiscal years ended June 30, 1952 through June 30, 1956, is as follows: Year EndedJune 30Total Tonnage1952620,7001953608,2101954577,9291955522,4101956529,600The number of tons of fertilizer sold by petitioner during each of the fiscal years ended June 30, 1949 through June 30, 1956, is as follows: Year EndedCynthi-Total TonsJune 30anaDanvilleShipped19495,4095,40919509,8659,865195111,86011,860195216,21616,216195317,73917,739195417,16710,12927,296195513,21111,90025,111195613,50114,02927,530*201 To the extent the aggregate amounts paid by petitioner to Deming and Van Deren during each of its fiscal years ended in 1954 and 1955 exceeded $80,000, such amounts did not constitute reasonable allowances for salaries or other compensation for personal services actually rendered. Opinion On its income tax returns for the fiscal years ended in 1954 and 1955 petitioner deducted as officers' salaries paid to Deming and Van Deren the amounts of $99,999.92 and $89,999.92, respectively. Respondent disallowed deductions for such years in the respective amounts of $41,239.92 and $31,239.92 on the ground that such amounts did not constitute reasonable compensation for services rendered. Petitioner has assigned error to this determination. The pertinent statutory references are section 23(a)(1)(A), Internal Revenue Code of 1939, 1 and section 162(a)(1), Internal Revenue Code of 1954. 2*202 Deductions are matters of legislative grace and the taxpayer must bring himself squarely within the statute under which the deduction is claimed. New Colonial Ice Co., Inc. v. Helvering, 292 U.S. 435; Deputy v. DuPont, 308 U.S. 488. It is well settled that the question of what constitutes reasonable compensation to an officer of a corporation is essentially a question of fact to be determined by the peculiar facts and circumstances in each particular case. Miller Manufacturing Co. v. Commissioner, 149 Fed. (2d) 421. Among the factors which have been considered, but not necessarily with equal importance, are the type and extent of services rendered by the employees; the scarcity of qualified employees for the particular position; the volume and amount of the taxpayer's business, including its special or peculiar characteristics, if any; the prevailing compensation paid to employees performing similar services in other comparable enterprises; and the general economic conditions. Mayson Manufacturing Co. v. Commissioner, 178 Fed. (2d) 115. Special scrutiny must be given to compensation paid to officers of a corporation wherein the*203 stock is closely held, because of the lack of arm's-length bargaining, which in turn may indicate an intent to affect and disguise distribution of profits. Golden Construction Co. v. Commissioner, 228 Fed. (2d) 637, and Heil Beauty Supplies, Inc. v. Commissioner, 199 Fed. (2d) 193, affirming Memorandum Opinions of this Court [13 TCM 1124; T.C. Memo. 1954-221 and 9 TCM 1125]. The taxpayer has the burden of proving that it is entitled to a deduction larger than that determined by the Commissioner. Botany Worsted Mills v. United States, 278 U.S. 282. The record is replete with evidence of the competence, aggressiveness and resourcefulness of Deming and Van Deren. They were familiar with the tobacco industry and conceived a plan to give farmers in the central Kentucky area a fertilizer service which had not been offered at the time petitioner was organized, namely, fertilizers especially designed to fit the needs of the particular soil to be fertilized. The fact that this service has subsequently been adopted to some extent by competitors of the petitioner is evidence of its soundness. Petitioner was*204 originally intended to cater to the tobacco market and to this end became a leader in producing fertilizers having high potash ratios because it was believed that such fertilizers would produce Burley tobacco with lower nicotine content and make such tobacco more saleable at a time when there was much talk of cancer from smoking. Since their introduction by petitioner the demand for higher potash tobacco fertilizers has substantially supplanted the demand for the types generally produced when petitioner was organized. This is persuasive evidence of the ability and foresight of Deming and Van Deren. When it became evident that the tobacco fertilizer market was going to decline because of acreage cuts, Deming and Van Deren made plans to get into the bluegrass fertilizer business. The petitioner purchased a few race horses to provide contacts with horse farm owners who were large consumers of bluegrass fertilizers. Their good business foresight is manifest when it is noted that the production of the Cynthiana plant has decreased considerably since the tobacco acreage cuts, while the production of the Danville plant has been steadily increasing. Furthermore, although the total amount*205 of fertilizer sold in Kentucky has been declining steadily since 1952, in each year since that date, with the exception of 1955 (when there was a 25 per cent tobacco acreage cut), petitioner's sales have increased. Thus it is clear that petitioner has consistently captured fertilizer business from competing companies. In reaching his determination respondent disallowed the claimed deductions to the extent they exceeded the amount ($58,760) claimed and allowed as officers' salaries for the fiscal year ended in 1953. The mere acceptance of acquiescence in the returns filed by a taxpayer in any previous year is not, as urged by petitioner, binding upon respondent. Niles Bement Pond Co. v. United States, 281 U.S. 357; Booth Newspapers. Inc., 17 T.C. 294, affd. per curiam 201 Fed. (2d) 55. On brief, however, respondent states his determination is based on the ground that it does not appear Deming and Van Deren had any increased work or responsibilities during the period in issue as compared to prior years. Thus, it appears that respondent's present position is based upon the reasonableness of compensation paid Deming and Van Deren in prior years. *206 He suggests that the increased sales of petitioner during its fiscal years ended in 1954 and 1955 were no more than a natural result of the increase in petitioner's productive capacity by the construction of the Danville plant which enabled petitioner to meet the growing demand for its product. We do not agree. It is clear that the duties and responsibilities of both Deming and Van Deren were considerably greater during the fiscal years ended in 1954 and 1955 than in 1953. The addition of the Danville plant required the training of new personnel for its operation. With the addition of the Danville plant it became necessary that Deming and Van Deren familiarize themselves with the manufacture of grass fertilizer since the new plant was intended to cater more to the grass market. In this connection it was necessary for them to contract for and arrange the delivery of types of raw materials different from those used in the Cynthiana plant which produced mainly tobacco fertilizer. Furthermore, the 42-county area in which petitioner wished to sell from the Danville plant was not the same as the 38-county area served by the Cynthiana plant, and the efforts and business ability of both Deming*207 and Van Deren were necessary and valuable to petitioner in developing sales in this new area. Respondent's statement that the increased sales by petitioner were due to the growing demand for its product is obviously correct. But in view of the fact that during the same period total fertilizer sales were decreasing in Kentucky it is also obvious that the fertilizer market was contracting and that petitioner's additional sales were due to increased aggressiveness and resourcefulness on the part of Deming and Van Deren rather than merely passively offering its product for sale. 3The fact that Deming was in Florida for three or four months out of each year is, as urged by respondent, to be considered in determining the reasonableness of compensation for services rendered. However, it has been recognized that a part-time president by virtue*208 of exceptional training and ability would merit higher compensation than a dull full-time officer who lacked these desirable qualities. Miller Manufacturing Co. v. Commissioner, supra.We are satisfied from the record that much of petitioner's success since its beginning and during the period in issue was due to Deming's widespread reputation, his personal contacts and his good business ability. This case is somewhat unusual in that petitioner has offered no evidence of salaries of officers having similar duties in comparable businesses, which is one of the most satisfactory tests. It is petitioner's contention, however, that its situation is unique and that there are no comparable businesses whose officers have similar abilities, duties and responsibilities. Respondent placed in the record testimony of an officer of a competitor of petitioner with regard to salaries of its officers. However, respondent failed to introduce facts sufficient to show a similarity in the nature of the business and the duties of such officers, therefore such testimony is not entitled to much weight. Cf. Long Island Drug Co., 35 B.T.A. 328, affd. 111 Fed. (2d) 593,*209 certiorari denied 311 U.S. 680. Respondent also urges that the payments in issue were in part intended as a distribution of profits. This argument loses some of its force since Deming and Van Deren each received the same amounts although they respectively owned or controlled approximately 76 and 24 per cent of petitioner's stock. However, respondent's argument is supported by the fact that petitioner has never paid a dividend in the seven-year period since its incorporation although it has had substantial earnings and profits. No explanation has been offered for its failure to do so. Cf. Long Island Drug Co., supra. The facts also show that the aggregate amounts paid Deming and Van Deren during each of the years in issue were not only considerably in excess of the amounts paid in prior years, 4 but they constituted a much greater portion of the petitioner's net income before salaries than in prior years. 5 Consideration of both factors leads us to believe that such payments were in part intended as a distribution of earnings. Cf. Atlas Plaster & Fuel Co. v. Commissioner, 55 Fed. (2d) 802, affirming 18 B.T.A. 1123. Our conclusion*210 is strengthened by the fact that the amounts paid to Deming and Van Deren, although not directly based upon, did fluctuate according to the income of petitioner. In the case of closely held corporations arrangements of this nature have been recognized as designed to syphon off earnings of the corporation under the guise of salary payments. R. H. Oswald Co., Inc. v. Commissioner, 185 Fed. (2d) 6, affirming a Memorandum Opinion of this Court [8 TCM 1037], certiorari denied 340 U.S. 953. We agree with respondent that the amounts paid and deducted as compensation to the officers, Deming and Van Deren, during each of the years involved is excessive and unreasonable. *211 We think, however, that on the facts presented, petitioner is entitled to a deduction for compensation paid such officers during each of the years involved somewhat in excess of that which respondent has determined. After taking all factors into consideration we have found as an ultimate fact that to the extent the aggregate amounts paid Deming and Van Deren during each of the fiscal years ended in 1954 and 1955 exceed the amount of $80,000 such amounts did not constitute reasonable allowance for salaries or other compensation for personal services actually rendered. Accordingly such excessive amounts are not deductible as ordinary and necessary business expenses within the meaning of section 23(a)(1)(A), Internal Revenue Code of 1939, and section 162(a)(1), Internal Revenue Code of 1954. Decision will be entered under Rule 50. Footnotes*. Represents two annual salaries of $7,200 which were received by Deming in the same calendar year.↩*. In a fertilizer analysis the first number reflects the nitrogen content: the second, the phosphoric acid content; and the third the potash content.↩*. Evidence of such amounts was not placed in the record.↩*. Included is bonus of $10,000 paid to each officer. ↩**. Included is bonus of $5,000 paid to each officer.↩1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In general. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * * ↩2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩3. Total fertilizer sales in Kentucky for the years 1954 and 1955 were less than the amount sold in 1953 by 5 and 15 per cent, respectively. During its fiscal years ended in 1954 and 1955 the total amount of fertilizer sold by petitioner was in excess of the amount sold during its fiscal year ended in 1953 by 54 and 42 per cent, respectively.↩4. The amounts paid Deming and Van Deren for each of the fiscal years ended in 1954 and 1955 exceeded the amounts paid to them for the fiscal year ended in 1953 by 70 and 53 per cent, respectively. ↩5. The amounts paid to Deming and Van Deren during each of the fiscal years ended in 1951 through 1955 constituted the following percentages of net income before salaries: ↩195155 per cent195241 per cent195343 per cent195477 per cent l195584 per cent